MICHAEL D. KNIGHT [Pro Se]

| | |
|---|---|
| **MICHAEL D. KNIGHT, individuals** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **vs.** ) | |
| ) | |
| **ALLY BANK; EUROPEAN AUTO** ) | |
| **EXPO; ALLY FINANCIAL INC;** ) | |
| **ALLY AUTO ASSETS, LLC; ALLY** ) | |
| **AUTO RECEIVABLES TRUST 2015-** ) | |
| **2; DEUTSCHE BANK TRUST** ) | |
| **COMPANY AMERICAS; AS** ) | |
| **TRUSTEE FOR THE ALLY AUTO** ) | |
| **RECEIVABLES TRUST 2015-2; AND** ) | |
| **DOES 1-100 INCLUSIVE.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |
| _____ ) | |

3:16CV910-AVC

2016 JUN 13 PM 1 48
U.S. DISTRICT COURT
NEW HAVEN CT.
FILED

## PLAINTIFF'S ORIGINAL PETITION/COMPLAINT

COMES NOW, Plaintiff, MICHAEL D. KNIGHT, complaining of the above named

defendants, and in support thereof would show the Court:

## I. INTRODUCTION

1.    This case by Plaintiff, once a consumer debtor of Ally Bank, brings this action

for 1) unjust enrichment; 2) violation of the Fair Credit Extension Uniformity Act

("FCEUA"); 3) violation of the Fair Debt Collection Practices Act ("FDCPA"); 4)

Negligent and Intentional Infliction of Emotional Distress; 5) Racketeering; 6)

Declaratory Judgment; and 8) Equitable and Injunctive relief.

2.     At least since April 15, 2010, the date described in the Pooling and Servicing Agreement (PSA), as explained in more detail below, the Defendants have engaged in a scheme whereby they issue Auto Loans to consumers and then seek to collect the amounts allegedly do to them which are not legally due to them.

## II. PARTIES

3.     Ally Bank is corporation, and Ally Bank sold the account to Ally Financial Inc. after a balance is created. Ally Financial Inc, then sells the account to Ally Auto Assets, LLC who sells to Deutsche Bank Trust Company Americas . Deutsche Bank Trust Company Americas, then holds the loan as trustee for the Ally Auto Receivables Trust 2015-2, which was then buying Ally Bank Corporate debt.

4.     The Ally Auto Receivable Trust 2015-2 then underwrites a bond offering. The bonds are placed into tranches from senior debt to junior debt and each tranches has a certain amount of assets. Ally Bank still services the account by sending out bills and accepting payment. However, Ally Bank has given up ownership rights, as required under contract, to the SLM Auto Loan Trust 2010-1; therefore Ally Bank and its affiliated or successor entities have given up their rights to sue its cardholders when they default on their debt because Ally Bank intentionally sold and relinquished its beneficial interest in Ally Bank accounts.  Despite this fact, Ally Bank has continued to pursue, along with its affiliates and the defendant law firms, collection lawsuits against Plaintiff to recover the obligations allegedly owed on the Ally Bank accounts.

5.     Plaintiffs continues to suffer monetary damages as a result of defendants' unlawful and improper conduct including, but not limited to, making payments to

defendants and or incurring other costs related to the defense of defendants improper efforts to collect relinquished debts from plaintiffs and the class.

### III. JURISDICTION AND VENUE

6.     Jurisdiction of this Court arises under FDCPA, 15 U.S.C. § 1692k (d), FCEUA, 73 P S §22709 28 U S C §1331 (federal question) and §1367(a) (supplemental jurisdiction), Racketeering influenced and corrupt Organizations Act 18 section 1962 (hereinafter referred to as RICO). Venue is appropriate in this federal district, pursuant to 28 U.S.C. § 1391, because events and omissions giving rise to Plaintiffs claims occurred within this federal judicial district and because Defendants reside and/or regularly transact business within this federal judicial district.

### IV. THE AUTO LOAN SECURITIZATION AND DEBT COLLECTION SCHEME

7.     At all times relevant hereto, Ally Bank's primary revenues came from interest income on loan receivables, securitization income derived from the transfer of auto loan receivables, securitization trusts, and subsequent issuance of beneficial interests through securitization transactions (hereinafter referred to as "the securitization").

8.     In order to earn securitization income from the Auto Loan securitization, Ally Bank sold its Auto Loan receivables to the Ally Auto Receivables Trust 2015-2.

9.     The Auto Loan securitization process is set forth in the amended and restated Pooling and Servicing Agreement ("PSA") between Ally Bank, as seller, and Deutsche Bank Trust Company Americas, the Ally Auto Receivables Trust 2015-2- trustee. A copy of the relevant portions of the PSA is attached hereto, incorporated herein and marked as **EXHIBIT "A". [Attach loan audit here].**



**Certified Forensic Loan Auditors**

# *CERTIFIED FORENSIC LOAN AUDITORS, LLC*

13101 West Washington Blvd., Suite 140, Los Angeles, CA 90066
Phone:  888-758-2352; 832-932-3951; Sales@CertifiedForensicLoanAuditors.com
www.CertifiedForensicLoanAuditors.com

# *PROPERTY*
# *SECURITIZATION ANALYSIS REPORT*™

### *Prepared for:*

### *Michael D. Knight*

### *For Property Identified As:*

### *Pre-Owned 2011 Infiniti QX56*
### *VIN #JN8AZ2NC8B9300610*

### *Prepared on:*

### *May 15, 2016*

Disclosure: You have engaged Certified Forensic Loan Auditors, LLC to examine your property and loan documents.  This information is not to be construed as legal advice or the practice of law pursuant to Business and Professions Code § 6125 et. seq., it is the intent of CFLA, its members, auditors and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: "...the doing and/or performing of services in a court of justice in any matter depending therein through the various stages and in conformity with the adopted rules of procedure.  It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court."

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## SECTION 1:    TRANSACTION DETAILS

### BORROWER & CO-BORROWER:

| BUYER/BORROWER | CO-BORROWER |
| --- | --- |
| Michael D. Knight | None |
| **BUYER ADDRESS** | **SUBJECT PROPERTY** |
| 111 Thomas Street<br>Hamden, CT 06514 | Pre-Owned 2011 Infiniti QX56<br>VIN #JN8AZ2NC8B9300610<br>4WD 4-Dr Sport Utility Vehicle |

VIN verification through:
http://www.decodethis.com/vin/JN8AZ2NC8B9300610

### TRANSACTION PARTICIPANTS

| AMOUNT FINANCED | LOAN SERVICER | SELLER |
| --- | --- | --- |
| **Cash Price $52,497.41**<br>Less: Down Payment $3,000.00<br>**Amount Financed**<br>**$49,497.41** | **Ally Bank**<br>**PO Box 380901**<br>**Bloomington, MN 55438** | **European Auto Expo** |
| **ORIGINAL LENDER** | **LOAN TYPE** | **CASH PRICE** |
| **European Auto Expo**<br>91 U.S. Highway Route 46 W.<br>Lodi, NJ 07644 | **75 Month Fixed 11.70%**<br>**Amortizing Retail Finance**<br>**Contract** | 1) Motor Vehicle &<br>Accessories: $50,352.41<br>2) Optional GAP<br>(Extended Service)<br>Contract:   $1,500.00<br>3) Tax & Fees:   $645.00<br>Total:   $52,497.41 |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

# SECTION 2:    SECURITIZATION
## SECURITIZATION PARTICIPANTS:

| ORIGINATOR/LENDER | SPONSOR/SELLER | DEPOSITOR |
|---|---|---|
| **Ally Bank/ European Auto Expo** | **Ally Financial Inc.** | **Ally Auto Assets LLC** |
| **ISSUING ENTITY** | **TRUSTEE** | **MASTER SERVICER/ SERVICER** |
| **Ally Auto Receivables Trust 2015-2** | <u>**Indenture Trustee:**</u> **Deutsche Bank Trust Company Americas** <br><br> <u>**Owner Trustee:**</u> **BNY Mellon Trust of Delaware** | **Ally Financial Inc./Ally Servicing LLC** |
| **CUSTODIAN** | **UNDERWRITERS** | **CLOSING DATE** |
| **Ally Financial Inc.** | **Barclays, BofA Merrill Lynch, RBC Capital Markets, BMO Capital Markets, CIBC, Lloyds Securities, PNC Capital Markets LLC, Scotiabank** | **September 16, 2015** |

Page | 3

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## PROSPECTUS COVER INFORMATION

424B5 1 d25614d424b5.htm PROSPECTUS SUPPLEMENT

Table of Contents

Filed Pursuant to Rule 424(b)(5)
Registration No. 333-186227

Prospectus Supplement to Prospectus dated July 9, 2015.

**ALLY AUTO RECEIVABLES TRUST 2015-2**
*Issuing Entity*
*$763,210,000 Asset Backed Notes, Classes A-2, A-3 and A-4*

**ALLY AUTO ASSETS LLC**
*Depositor*

**ALLY BANK**
*Sponsor*

ally

**ALLY FINANCIAL INC.**
*Servicer*

| | | |
|---|---|---|
| **Barclays** | **BofA Merrill Lynch** | **RBC Capital Markets** |

**BMO Capital Markets**      **CIBC**      **Lloyds Securities**      **PNC Capital Markets LLC**      **Scotiabank**

The date of this prospectus supplement is September 10, 2015

http://www.sec.gov/Archives/edgar/data/1477336/000119312515319512/d25614d424b5.htm

Page | 4

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## PROSPECTUS EXTRACTS

Prospectus Supplement to Prospectus dated July 9, 2015.
## ALLY AUTO RECEIVABLES TRUST 2015-2
*Issuing Entity*
*$763,210,000 Asset Backed Notes, Classes A-2, A-3 and A-4*
## ALLY AUTO ASSETS LLC
*Depositor*
## ALLY BANK
*Sponsor*
## ALLY FINANCIAL INC.
*Servicer*

You should consider carefully the risk factors beginning on page S-7 in this prospectus supplement and on page 2 in the prospectus.

The notes represent obligations of the issuing entity only. The notes do not represent obligations of or interests in, and are not guaranteed by, Ally Auto Assets LLC, Ally Bank, Ally Financial Inc. or any of their affiliates. Neither the notes nor the receivables are insured or guaranteed by any governmental entity.

This prospectus supplement may be used to offer and sell the notes only if accompanied by the prospectus.

The issuing entity is offering the following classes of notes[1]:

| | Class A-2a Notes | Class A-2b Notes | Class A-3 Notes | Class A-4 Notes |
|---|---|---|---|---|
| Principal Balance | $150,000,000 | $183,000,000 | $333,000,000 | $97,210,000 |
| Interest Rate | 0.98% | One-Month LIBOR + 0.43% | 1.49% | 1.64% |
| Initial Distribution Date | October 15, 2015 | October 15, 2015 | October 15, 2015 | October 15, 2015 |
| Final Scheduled Distribution Date | March 15, 2018 | March 15, 2018 | November 15, 2019 | June 15, 2020 |
| Distribution Frequency | Monthly | Monthly | Monthly | Monthly |
| Price to Public | 99.99905% | 100.00000% | 99.99515% | 99.99405% |
| Underwriting Discount | 0.200% | 0.200% | 0.250% | 0.300% |
| Proceeds to the Depositor | 99.79905% | 99.80000% | 99.74515% | 99.69405% |

[1]   The issuing entity will also issue Class A-1 Notes with an initial principal balance of $260,000,000 and a final scheduled distribution date of September 15, 2016.

The interest rate for each class of notes, other than the Class A-2b Notes, will be a fixed rate.
The interest rate for the Class A-2b Notes will be a floating rate.
The aggregate principal amount of the securities being offered under this prospectus supplement is $763,210,000.
The primary assets of the issuing entity will be a pool of fixed rate retail installment sale contracts and direct purchase money loans used to finance the purchase of new and used cars and light trucks.

**Credit Enhancement and Liquidity**

- Reserve account, with an initial deposit of $2,709,763.92.
- Overcollateralization in the initial amount of $4,875,566.08.
- Class B Asset Backed Notes, with a principal balance of $22,760,000.
- Class C Asset Backed Notes, with a principal balance of $18,750,000.
- Class D Asset Backed Notes, with a principal balance of $14,310,000.
- The Class A-1 Notes, Class B Notes, the Class C Notes and the Class D Notes are not being offered under this prospectus supplement and instead will be sold in private placements or retained initially by the depositor or its affiliate.
- The Class D Notes are subordinated to the Class A Notes, the Class B Notes and the Class C Notes
- The Class C Notes are subordinated to the Class A Notes and the Class B Notes.
- The Class B Notes are subordinated to the Class A Notes.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or determined if this prospectus supplement or the prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

| Barclays | | BofA Merrill Lynch | | RBC Capital Markets |
|---|---|---|---|---|
| BMO Capital Markets | CIBC | Lloyds Securities | PNC Capital Markets LLC | Scotiabank |

The date of this prospectus supplement is September 10, 2015

Page | 5

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

## SUMMARY OF TRANSACTION AND PARTIES

### SUMMARY

This summary highlights selected information from this document and does not contain all of the information that you need to consider in making your investment decision. To understand the material terms of this offering of the offered notes, carefully read this entire document and the accompanying prospectus.

### THE PARTIES

*Sponsor*

Ally Bank

*Issuing Entity*

Ally Auto Receivables Trust 2015-2 will be the issuing entity of the notes and the certificates. In this prospectus supplement and in the accompanying prospectus, we also refer to the issuing entity as the "**trust**."

*Depositor*

Ally Auto Assets LLC will be the depositor to the issuing entity.

*Servicers*

Ally Financial Inc. or "**Ally Financial,**" will be the servicer and Ally Servicing LLC will be the sub-servicer providing collection and administrative servicing for the servicer

*Indenture Trustee*

Deutsche Bank Trust Company Americas.

*Owner Trustee*

BNY Mellon Trust of Delaware.

### THE NOTES

The issuing entity will offer the classes of notes listed on the cover page of this prospectus supplement. The notes will be available for purchase in denominations of $1,000 and integral multiples thereof, and will be available in book-entry form only. We sometimes refer to these notes as the "**offered notes.**"

The "**record date**" for any distribution date will be the close of business on the date immediately preceding the distribution date, or if definitive notes are issued, the last day of the preceding monthly period.

The final scheduled distribution dates of the offered notes are listed on the cover page of this prospectus supplement

The issuing entity will also issue Class A-1 Notes with an initial principal balance of $260,000,000, Class B Notes with an initial principal balance of $22,760,000, Class C Notes with an initial principal balance of $18,750,000 and Class D Notes with an initial principal balance of $14,310,000. The Class A-1 Notes will have a final scheduled distribution date of September 15, 2016. The Class B Notes will have a final scheduled distribution date of October 15, 2020. The Class C Notes will have a final scheduled distribution date of January 15, 2021. The Class D Notes will have a final scheduled distribution date of March 15, 2022. The Class A-1 Notes, the Class B Notes, the Class C Notes and the Class D Notes are not being offered under this prospectus supplement. The Class A-1 Notes, Class B Notes, the Class C Notes and the Class D Notes will be sold in one or more private placements or retained initially by the depositor or its affiliate. If the Class A-1 Notes, Class B Notes, the Class C Notes or the Class D Notes are initially retained by the depositor or its affiliate, the depositor or its affiliate will retain the right to sell all or a portion of such retained notes at any time.

*Interest Payments*

- The interest rate for each class of notes, other than the Class A-2b Notes, will be a fixed rate. The interest rate for the Class A-2b Notes will be a floating rate. We refer in this prospectus supplement to notes that bear interest at a floating rate as "**floating rate notes**" and to notes that bear interest at a fixed rate as "**fixed rate notes.**"

S-1

Page | 6

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

- Interest will accrue on the notes from and including the closing date to but excluding the first distribution date and for each monthly period thereafter, as set forth below.

- The issuing entity will pay interest on the notes on the fifteenth day of each calendar month, or if that day is not a business day, the next business day, beginning on October 15, 2015. We refer to these dates as "**distribution dates.**"

- The issuing entity will pay interest on the fixed rate notes, other than the Class A-1 Notes, on each distribution date based on a 360-day year consisting of twelve 30-day months. The issuing entity will pay interest on the Class A-1 Notes on each distribution date based on the actual days elapsed during the period for which interest is payable and a 360-day year.

- The issuing entity will pay interest on the floating rate notes on each distribution date based on the actual days elapsed during the period for which interest is payable and a 360-day year.

- Interest payments on all classes of the Class A Notes will have the same priority.

- The payment of interest on the Class B Notes is subordinated to the payment of interest on, and, in limited circumstances, payments of principal of, the Class A Notes, the payment of interest on the Class C Notes is subordinated to the payment of interest on, and, in limited circumstances, payments of principal of, the Class A Notes and the Class B Notes, and the payment of interest on the Class D Notes is subordinated to the payment of interest on, and, in limited circumstances, payments of principal of, the Class A Notes, the Class B Notes and the Class C Notes, in each case to the extent described in *"Priority of Distributions."* In general, no interest will be paid on the Class B Notes on any distribution date until all interest due and payable on the Class A Notes has been paid in full, no interest will be paid on the Class C Notes on any distribution date until all interest due and payable on the Class A Notes and the Class B Notes has been paid in full, and no interest will be paid on the Class D Notes on any distribution date until all interest due and payable

on the Class A Notes, the Class B Notes and the Class C Notes has been paid in full.

*Principal Payments*

- The issuing entity will pay principal on the notes monthly on each distribution date.

- The issuing entity will make principal payments on the notes based on the amount of collections and defaults on the receivables during the prior month.

- On each distribution date, except as described below under *"Priority of Distributions— Acceleration,"* the amounts available to make principal payments on the notes will be applied as follows:

(1) to the Class A-1 Notes, until the Class A-1 Notes are paid in full,

(2) to the Class A-2 Notes, pro rata among the Class A-2a Notes and the Class A-2b Notes, until the Class A-2 Notes are paid in full,

(3) to the Class A-3 Notes, until the Class A-3 Notes are paid in full,

(4) to the Class A-4 Notes, until the Class A-4 Notes are paid in full,

(5) to the Class B Notes, until the Class B Notes are paid in full,

(6) to the Class C Notes, until the Class C Notes are paid in full, and

(7) to the Class D Notes, until the Class D Notes are paid in full.

- The failure of the issuing entity to pay any class of notes in full on or before its final scheduled distribution date will constitute an event of default.

**THE CERTIFICATES**

On the closing date, the issuing entity will issue certificates. The certificates will be initially retained by the depositor and are not being offered under this prospectus supplement. The depositor will retain the

S-2

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
-All Rights Reserved-



**Certified Forensic Loan Auditors**

right to sell all or a portion of the certificates at any time.

## THE RECEIVABLES

*Property of the Issuing Entity*

The primary assets of the issuing entity will be a pool of fixed rate retail motor vehicle installment sale contracts and direct purchase money loans used to finance the purchase of new and used cars and light trucks. We refer to the persons who financed their purchases with these contracts and loans as "**obligors.**" A portion of the contracts and loans sold to the issuing entity on the closing date were acquired or originated by Ally Bank under special incentive rate financing programs, and we refer to those contracts and loans as "**subvented receivables.**" We refer to the remaining contracts and loans that are not subvented receivables and are sold to the issuing entity on the closing date as "**non-subvented receivables.**" We use the term "**receivables**" to mean both subvented receivables and non-subvented receivables. Further, when we use the term "**remaining payments**" on receivables as of a specific date, we mean all scheduled payments that have not been received prior to that specified date.

The receivables in the issuing entity will be sold on the closing date by Ally Bank to the depositor, and then by the depositor to the issuing entity. The issuing entity will grant a security interest in the receivables and the other property of the issuing entity to the indenture trustee on behalf of the noteholders. Ally Bank, Ally Financial, as servicer, or the depositor may be required to repurchase receivables from the issuing entity in specified circumstances, as detailed in the accompanying prospectus under "*The Servicer—Servicing Procedures.*"

The issuing entity's property will, subject to other specific exceptions described in the prospectus, also include:

- the remaining payments on the receivables as of a cutoff date of August 1, 2015 and monies received with respect to those remaining payments; we refer to that date as the "**cutoff date.**"

- amounts held on deposit in trust accounts maintained for the issuing entity.

- security interests in the vehicles financed by the receivables,

- any recourse Ally Bank has against the dealers from which it purchased the receivables,

- any proceeds from claims on insurance policies covering the financed vehicles,

- specified rights of the depositor under its purchase agreement with Ally Bank, and

- all rights of the issuing entity under the related transfer agreement with the depositor.

*Receivables Principal Balance*

The initial aggregate discounted principal balance of the subvented receivables to be sold to the issuing entity on the closing date, which is the present value of all remaining payments as of the cutoff date, discounted for each receivable, at the greater of 3.00% per annum and the actual annual percentage rate of the receivable, is $190,499,926.30. The initial aggregate discounted principal balance of the non-subvented receivables to be sold to the issuing entity on the closing date, which is the present value of all remaining payments as of the cutoff date, discounted for each receivable, at the greater of 3.00% per annum and the actual annual percentage rate of the receivable, is $893,405,639.80. The combined initial aggregate discounted principal balance of all the receivables, as calculated for each type of receivable as set forth above, as of the cutoff date is $1,083,905,566.10, which represents the purchase price paid by the depositor to the sponsor for the receivables. We refer to this initial balance as the "**initial aggregate receivables principal balance.**" We refer to the aggregate principal balance of all receivables, as calculated for each type of receivable as of any given time, as the "**aggregate receivables principal balance.**"

As of the cutoff date, the 3.00% discount rate was applied to a receivables balance of $356,581,628.18, which is approximately 32.58% of the aggregate amount financed of all receivables of the issuing entity.

S-3

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

As of the cutoff date, the receivables had the following characteristics:

| | |
|---|---|
| Aggregate Amount Financed | $1,094,598,443.79 |
| Number of Contracts in Pool | 59,975 |
| Average Amount Financed | $ 18,250.91 |
| Weighted Average APR of all Receivables in Pool | 4.34% |
| Weighted Average FICO Score | 740.24 |
| Weighted Average Original Term (In Months) | 65.95 |
| Weighted Average Remaining Term (In Months) | 52.31 |
| Percentage of Contracts with Original Terms greater than 60 months | 65.62% |
| Percentage of New Vehicles | 70.90% |

See *"The Receivables Pool"* in this prospectus supplement for more information about the data set forth in the chart above.

*Overcollateralization*

The initial aggregate receivables principal balance will exceed the aggregate principal balance of the notes on the closing date by approximately 0.45% of the initial aggregate receivables principal balance. The application of funds as described in the eleventh priority of distributions is designed to increase over time the amount of overcollateralization as of any distribution date to a target amount, which we refer to as the **"overcollateralization target amount."** The overcollateralization target amount will be 1.30% of the initial aggregate receivables principal balance.

**PRIORITY OF DISTRIBUTIONS**

The issuing entity will distribute available funds in the following order of priority:

* basic servicing fee payments to the servicer,

* interest on the Class A Notes, pro rata among the Class A Notes,

* principal on the notes in an amount equal to the excess, if any, of the aggregate principal balance of the Class A Notes over the aggregate receivables principal balance,

* interest on the Class B Notes,

* principal on the notes in an amount equal to the excess, if any, of the aggregate principal balance of the Class A Notes and the Class B Notes—reduced by the amount of principal allocated to the notes above—over the aggregate receivables principal balance,

* interest on the Class C Notes,

* principal on the notes in an amount equal to the excess, if any, of the aggregate principal balance of the Class A Notes, the Class B Notes and the Class C Notes—reduced by the amounts of principal allocated to the notes above—over the aggregate receivables principal balance,

* interest on the Class D Notes,

* principal on the notes in an amount equal to the excess, if any, of the aggregate principal balance of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes—reduced by the amounts of principal allocated to the notes above—over the aggregate receivables principal balance,

* deposits into the reserve account, until the amount in the reserve account equals the specified reserve account balance,

* principal on the notes in an amount equal to the lesser of (a) the aggregate principal balance of the notes—reduced by the amounts of principal allocated to the notes above, and (b) the excess of the aggregate principal balance of the notes—reduced by the amounts of principal allocated to the notes above—over an amount equal to the aggregate receivables principal balance minus the overcollateralization target amount,

* any costs of the indenture trustee incurred associated with a resignation of the servicer and the appointment of a successor servicer, to the indenture trustee,

* to the owner trustee, the indenture trustee and the administrator, amounts due and owing under the trust agreement, the indenture, the servicing agreement and the administration agreement, which have not been previously paid in full, and

S-4

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

• any remaining amounts, to the certificateholders.

*Acceleration*

If an event of default occurs and the notes are accelerated, until the time when all events of default have been cured or waived as provided in the indenture, the issuing entity will pay interest and principal first on the Class A Notes. Interest will be paid pro rata among the classes of Class A Notes and principal will be paid sequentially by class starting with the Class A-1 Notes. No interest or principal will be payable on the Class B Notes until all principal of and interest on the Class A Notes have been paid in full, no interest or principal will be payable on the Class C Notes until all principal of and interest on the Class A Notes and the Class B Notes have been paid in full, and no interest or principal will be payable on the Class D Notes until all principal of and interest on the Class A Notes, the Class B Notes and the Class C Notes have been paid in full.

**RESERVE ACCOUNT**

On the closing date, the depositor will cause the noteholders to deposit $2,709,763.92 in cash or eligible investments into the reserve account. Collections on the receivables, to the extent available for this purpose, will be added to the reserve account on each distribution date, until the amount in the reserve account equals the specified reserve account balance. See *"The Transfer Agreements and the Servicing Agreements—Reserve Account"* in this prospectus supplement for additional information.

To the extent that funds from principal and interest collections on the receivables are not sufficient to pay the basic servicing fee and to pay the amounts that are prior to the deposits into the reserve account as described under *"Priority of Distributions"* above, the amount previously deposited in the reserve account provides an additional source of funds for those payments.

**SERVICING FEES**

The issuing entity will pay monthly to the servicer (a) a basic servicing fee equal to 1.00% per annum as compensation for servicing the receivables and (b) a

supplemental servicing fee equal to any late fees, prepayment charges and other administrative fees and expenses collected during the month and investment earnings on the trust accounts.

**REDEMPTION OF THE NOTES**

When the aggregate receivables principal balance declines to 10% or less of the initial aggregate receivables principal balance, the servicer may purchase all of the remaining receivables. If the servicer purchases the receivables, the outstanding notes will be redeemed at a price equal to their remaining principal balance, plus accrued and unpaid interest thereon.

**TAX STATUS**

Kirkland & Ellis LLP, special tax counsel, has delivered its opinion that:

• the offered notes will be characterized as indebtedness for federal income tax purposes, and

• the issuing entity will not be taxable as an association or publicly traded partnership taxable as a corporation.

Each noteholder, by accepting an offered note, will agree to treat the offered notes as indebtedness for federal, state and local income and franchise tax purposes.

**ERISA CONSIDERATIONS**

Subject to the restrictions and considerations discussed under *"ERISA Considerations"* in this prospectus supplement and in the accompanying prospectus, the offered notes may be purchased by or for the account of (a) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the provisions of Title I of ERISA, (b) a "plan" subject to Section 4975 of the Internal Revenue Code of 1986, as amended, or (c) any entity whose underlying assets include "plan assets" by reason of an employee benefit plan's or a plan's investment in the entity. We suggest that any of the foregoing types of entities consult with its counsel before purchasing the offered notes. See

S-5

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

"*ERISA Considerations*" in this prospectus supplement and the prospectus for additional information.

### RATINGS

We expect that the offered notes will receive credit ratings from at least two nationally recognized rating agencies hired by us.

The rating agencies have discretion to monitor and adjust the ratings on the offered notes. The offered notes may receive an unsolicited rating that is different from or lower than the ratings provided by the rating agencies hired to rate the offered notes. As of the date of this prospectus supplement, we are not aware of any unsolicited ratings on the offered notes. A rating, change in rating or a withdrawal of a rating by one rating agency may not correspond to a rating, change in rating or withdrawal of a rating from any other rating agency. See "*Risk Factors—The Ratings for the Securities Are Limited in Scope, May Be Unsolicited, May Not Continue to Be Issued and Do Not Consider the Suitability of the Securities for You*" in the accompanying prospectus for more information.

### CERTAIN INVESTMENT COMPANY ACT CONSIDERATIONS

The issuing entity is not registered or required to be registered as an "investment company" under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"). In determining that the issuing entity is not required to be registered as an investment company, the issuing entity is relying on the exemption provided by Rule 3a-7 under the Investment Company Act, although there may be additional exclusions or exemptions that the issuing entity could rely on as well. As of the closing date, the issuing entity will be structured so as not to constitute a "covered fund" for purposes of the regulations, commonly referred to as the "Volcker Rule," adopted to implement Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the "**Dodd-Frank Act**."

### RISK FACTORS

Before making an investment decision, you should consider carefully the factors that are set forth in "*Risk Factors*" beginning on page S-7 of this prospectus supplement and page 2 of the accompanying prospectus.

**http://www.sec.gov/Archives/edgar/data/1477336/000119312515319512/d25614d424b5.htm**

**P. S-1 to S-6**

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

**SUMMARY OF TRANSACTION PARTIES***



* This chart provides only a simplified overview of the relationships among the key parties to the transaction. Refer to this prospectus supplement and the prospectus for a further description.

** See *"Summary—Priority of Distributions"* for a description of the relative priorities of each class. The Class A-1 Notes, the Class B Notes, the Class C Notes or the Class D Notes may be retained initially by the depositor or its affiliate or sold in one or more private placements. The certificates will be retained initially by the depositor.

http://www.sec.gov/Archives/edgar/data/1477336/000119312515319512/d25614d424b5.htm

**P. S-12**

Page | 12

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## Affiliations among securitizing parties

### AFFILIATIONS AND RELATIONSHIPS AMONG TRANSACTION PARTIES

The owner trustee is not an affiliate of any of the depositor, the sponsor, the servicer, the issuing entity or the indenture trustee. However, the owner trustee and one or more of its affiliates may, from time to time, engage in arm's-length transactions with the depositor, the sponsor, the servicer, the indenture trustee or affiliates of any of them, that are distinct from its role as owner trustee, including transactions both related and unrelated to the securitization of retail motor vehicle instalment sale contracts. The owner trustee and its affiliates, during the past two years, have not engaged in any transactions that are material to this transaction with any of the depositor, the sponsor, the servicer, the issuing entity or the indenture trustee that are outside of the ordinary course of business or that are other than at arm's length.

The indenture trustee is not an affiliate of any of the depositor, the sponsor, the servicer, the issuing entity or the owner trustee. However, the indenture trustee and one or more of its affiliates may, from time to time, engage in arm's-length transactions with the depositor, the sponsor, the servicer, the owner trustee or affiliates of any of them, that are distinct from its role as indenture trustee, including transactions both related and unrelated to the securitization of retail vehicle instalment sale contracts. The indenture trustee and its affiliates, during the past two years, have not engaged in any transactions that are material to this transaction with any of the depositor, the sponsor, the servicer, the issuing entity or the owner trustee that are outside of the ordinary course of business or that are other than at arm's length.

The sponsor, the servicer and the depositor are affiliates and also engage in transactions with each other involving securitizations, including public offerings and private placements of asset-backed securities as well as commercial paper conduit financing, of retail vehicle instalment sale contracts, including those described in this prospectus supplement and others. Specifically, the depositor and Ally Bank have entered into an intercompany advance agreement through which the depositor may borrow funds from Ally Bank to fund its general operating expenses and, for some securitization transactions in which the depositor acts as the depositor, to pay for a portion of the receivables pursuant to the pooling agreement and transaction expenses. Under the intercompany advance agreement, the loans bear a market rate of interest and have documented repayment terms.

On the closing date, the issuing entity is issuing certificates, not offered hereby. The depositor will initially retain the certificates, which represents the principal equity in the issuing entity. Therefore, the issuing entity will be a direct subsidiary of the depositor and an indirect subsidiary of the sponsor. The depositor retains the right to sell all or a portion of the certificates at any time. Following any such sale to an unaffiliated third party, the issuing entity may cease to be an affiliate of either the sponsor or the depositor. The issuing entity has not engaged, and will not engage, in any material transactions with the sponsor or the depositor that are outside of the ordinary course of business or that are other than at arm's length.

**http://www.sec.gov/Archives/edgar/data/1477336/000119312515319512/d25614d424b5.htm**

**P. S-13**

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## CASHFLOWS AMONG PARTIES

### Obligors on Receivables are a necessary part of the securitization transaction

SUMMARY OF MONTHLY DEPOSITS TO AND WITHDRAWALS FROM ACCOUNTS*



* This chart provides only a simplified overview of the monthly flow of funds. Refer to this prospectus supplement and the prospectus for a further description.

http://www.sec.gov/Archives/edgar/data/1477336/000119312515319512/d25614d424b5.htm

P. S-14

Page | 14

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## SALE AND ASSIGNMENT OF RECEIVABLES

**Sale and Assignment of Receivables**

On the closing date, Ally Bank will sell and assign to the depositor, without recourse, its entire interest in the receivables, including its security interests in the financed vehicles, pursuant to a Pooling Agreement between Ally Bank and the depositor. The depositor will transfer and assign to the applicable trust, without recourse, its entire interest in the receivables, including its security interests in the financed vehicles, pursuant to a Trust Sale

33

Agreement between the depositor and the trust. Each receivable of a trust will be identified in a schedule which will be on file at the locations set forth in an exhibit to the related Trust Sale Agreement. The trust will, concurrently with the transfer and assignment, execute and deliver the trust's notes and certificates to the depositor in exchange for the receivables. The depositor will sell the securities offered by this prospectus and the accompanying prospectus supplement, which may or may not include all securities of a series, to the respective underwriters or initial purchasers or as otherwise set forth in the accompanying prospectus supplement. See "*Plan of Distribution*" in this prospectus.

The accompanying prospectus supplement will provide the terms, conditions and manner under which additional receivables will be sold by Ally Bank to the depositor and by the depositor to the trust during the Revolving Period, if any.

In each Pooling Agreement, Ally Bank will represent and warrant to the depositor, among other things, that:

* the information provided in the schedule of receivables exhibit to the Trust Sale Agreement is correct in all material respects,

* the obligor on each receivable is required to maintain physical damage insurance covering the financed vehicle in accordance with Ally Bank's normal requirements,

* as of the respective sale date, to the best of its knowledge, the receivables are free and clear of all filed security interests, liens, charges and encumbrances on account of work, labor or materials other than tax liens and other liens that arise by operation of law and no offsets, defenses or counterclaims have been asserted or threatened,

* as of the respective sale date, each receivable is or will be secured by a first perfected security interest in favor of Ally Bank in the financed vehicle, and

* each receivable, at the time it was originated complied, and as of the respective sale date complies, in all material respects with applicable federal and state laws, including, without limitation, consumer credit, truth-in-lending, equal credit opportunity and disclosure laws.

In the Trust Sale Agreement, the depositor will assign the representations and warranties of Ally Bank, as set forth above, to the trust, and will represent and warrant to the trust that the depositor has taken no action which would cause the representations and warranties of Ally Bank to be false in any material respect as of the respective sale date.

As of the last day of the second, or, if the depositor elects, the first, month following the discovery by Ally Bank, the depositor, the servicer, the owner trustee or the indenture trustee of a breach of any representation or warranty of the depositor or Ally Bank that materially and adversely affects the interests of the securityholders in any receivable, the depositor, unless the breach is cured in all material respects, will repurchase or, will enforce the obligation of Ally Bank under the Pooling Agreement to repurchase the Warranty Receivable from the trust at a price equal to the Warranty Payment. The depositor or Ally Bank, as applicable, will be entitled to receive any amounts held by the servicer or in the Payment Ahead Servicing Account for that Warranty Receivable. The repurchase obligation constitutes the sole remedy

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

available to the trust, the noteholders, the indenture trustee, the certificateholders or the owner trustee for any uncured breaches.

In each Servicing Agreement, the servicer will covenant that:

- except as contemplated in that agreement, the Pooling Agreement, the Trust Sale Agreement, the indenture and the trust agreement, the servicer will not release any financed vehicle from the security interest securing the receivable,

- the servicer will do nothing to impair the rights of the indenture trustee, the owner trustee, the trust, the noteholders or the certificateholders in the receivables, and

34

- the servicer will not amend or otherwise modify any receivable so that the Amount Financed, the APR, the total number of Scheduled Payments, in the case of a Scheduled Interest Receivable, or the number of originally scheduled due dates, in the case of a Simple Interest Receivable, is altered or so that the last Scheduled Payment, in the case of a Scheduled Interest Receivable, or the last scheduled due date, in the case of a Simple Interest Receivable, occurs after the final scheduled distribution date.

As of the last day of the second, or, if the servicer so elects, the first, month following the discovery by the servicer, the owner trustee or the indenture trustee of a breach of any covenant that materially and adversely affects any receivable and unless the breach is cured in all material respects, the servicer will make an Administrative Purchase Payment for the Administrative Receivable. The servicer will be entitled to receive any amounts held by the servicer or in the Payment Ahead Servicing Account for the Administrative Receivable. This repurchase obligation constitutes the sole remedy available to the trust, the indenture trustee, the owner trustee, the noteholders and the certificateholders for any uncured breaches.

Pursuant to each Servicing Agreement, the trust will agree to Ally Financial acting as custodian to maintain possession, as the trust's agent, of the retail installment sale contracts, purchase money loans and any other documents relating to the receivables. To assure uniform quality in servicing both the receivables and Ally Financial's own portfolio of receivables, as well as to facilitate servicing and save administrative costs, the documents will not be physically segregated from other similar documents that are in Ally Financial's possession nor will the documents be stamped or marked to reflect the transfer to the trust so long as Ally Financial is the custodian of these documents. However, Uniform Commercial Code financing statements reflecting the sale and assignment of the receivables to the trust and the pledge by the trust to the indenture trustee will be filed, and Ally Bank's accounting records and computer files will reflect the sale and assignment. Because the receivables will remain in the possession of Ally Financial, as custodian, and will not be stamped or otherwise marked to reflect the assignment to the trust or the pledge to the indenture trustee, if a subsequent purchaser were able to take physical possession of the receivables without knowledge of the assignment, the trust's and the indenture trustee's interests in the receivables could be defeated.

**Additional Sales of Receivables**

In addition to receivables that the depositor buys from Ally Bank on a closing date as described above in this subsection, the depositor may also buy receivables from Ally Bank to transfer to a trust on one or more later dates for that trust as described further in the applicable prospectus supplement. The depositor would buy those receivables on substantially the same terms as under the pooling agreement for the initial closing. The depositor would then sell receivables that the depositor has bought from Ally Bank to a trust, pursuant to a trust sale agreement. On the initial closing date, the trust will apply the net proceeds received from the sale of its notes and certificates to pay the depositor for the receivables that are being sold to that trust, and, to the extent specified in the accompanying prospectus supplement, to make a deposit in an additional funding account and initial deposits in other trust accounts. If there is an additional funding account, then the depositor will buy additional receivables from Ally Bank, and sell them to the trust from time

Page | 16



**Certified Forensic Loan Auditors**

to time during the additional funding period, as described further in the related prospectus supplement. If the depositor receives a tax opinion confirming the tax status of the trust, it may also sell additional receivables to a trust at a later closing date and, concurrently, with this sale, execute and deliver additional notes and certificates of the trust to fund the purchase of the additional receivables.

http://www.sec.gov/Archives/edgar/data/1477336/000119312515319512/d25614d424b5.htm
P. S-34 to S-35

## POOLING AGREEMENT

**POOLING AGREEMENT**

**BETWEEN**

**ALLY AUTO ASSETS LLC**

**AND**

**ALLY BANK**

**DATED AS OF SEPTEMBER 16, 2015**

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex43.htm
P. i

THIS POOLING AGREEMENT, dated as of September 16, 2015, is between ALLY AUTO ASSETS LLC, a Delaware limited liability company ("Ally Auto"), and ALLY BANK, a Utah chartered bank (the "Seller").

WHEREAS, Ally Auto desires to purchase on the date hereof a portfolio of automobile and light truck retail instalment sale contracts, direct purchase money loans and related rights owned by the Seller;

WHEREAS, the Seller is willing to sell on the date hereof such contracts and related rights to Ally Auto;

WHEREAS, Ally Auto may wish to sell or otherwise transfer on the date hereof such contracts and related rights, or interests therein, to a trust, corporation, partnership or other entity (any such entity being the "Issuing Entity"); and

WHEREAS, the Issuing Entity may issue debentures, notes, participations, certificates of beneficial interest, partnership interests or other interests or securities (collectively, any such issued interests or securities being "Securities") to fund its acquisition of such contracts and related rights.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex43.htm
P. 1

Page | 17

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## ARTICLE II
## PURCHASE AND SALE OF RECEIVABLES

SECTION 2.01 <u>Purchase and Sale of Receivables</u>.

(a) <u>Purchase</u>. On the Closing Date, subject to satisfaction of the conditions specified in <u>Article V</u> and the First Step Receivables Assignment (and, in any event, immediately prior to consummation of the related transactions contemplated by the Further Transfer Agreements, if any), the Seller shall sell, transfer, assign and otherwise convey to Ally Auto, without recourse:

(i) all right, title and interest of the Seller in, to and under the Receivables listed on the Schedule of Receivables and all monies received thereon on and after the Cutoff Date, exclusive of any amounts allocable to the premium for physical damage collateral protection insurance required by the Seller or the Servicer covering any related Financed Vehicle;

(ii) the interest of the Seller in the security interests in the Financed Vehicles granted by Obligors pursuant to the Receivables and, to the extent permitted by law, any accessions thereto;

(iii) the interest of the Seller in any proceeds from claims on any physical damage, credit life, credit disability or other insurance policies covering the related Financed Vehicles or Obligors;

(iv) the interest of the Seller in any proceeds from recourse against Dealers on the Receivables;

(v) all right, title and interest of the Seller in, to and under the First Step Receivables Assignment; and

(vi) all present and future claims, demands, causes and choses in action in respect of any or all the foregoing described in <u>clauses (i)</u> through <u>(v)</u> above and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all the foregoing, including all proceeds of the conversion of any or all of the foregoing, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, investment property, payment intangibles, general intangibles, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

The property described in <u>clauses (i)</u> through <u>(vi)</u> above is referred to herein collectively as the "<u>Purchased Property</u>."

(b) It is the intention of the Seller and Ally Auto that the sale, transfer, assignment and other conveyances of the Receivables contemplated by this Agreement and the First Step Receivables Assignment shall constitute a sale of the Receivables from the Seller to Ally Auto and the beneficial interest in and title to the Receivables shall not be part of the Seller's estate in the event of the filing of a petition for insolvency, receivership or conservatorship by or against the Seller or placement into receivership or conservatorship of the Seller under any relevant bankruptcy, insolvency, receivership or conservatorship law.

2

(c) The sale, transfer, assignment and other conveyances of Receivables contemplated by this Agreement and the First Step Receivables Assignment do not constitute and are not intended to result in the creation of or an assumption by Ally Auto of any obligation of the Seller, the Servicer or any other Person to the Obligors, Dealers, insurers or any other Person in connection with the Receivables, any Dealer Agreements, any insurance policies or any other agreement or instrument relating to any of them.

Page | 18

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

SECTION 2.02 <u>Receivables Purchase Price</u>. In consideration for the Purchased Property, Ally Auto shall, on the Closing Date, pay to the Seller an amount equal to the Initial Aggregate Receivables Principal Balance in respect of the Receivables and the Seller shall execute and deliver to Ally Auto an assignment in the form attached hereto as <u>Exhibit A</u> (the "<u>First Step Receivables Assignment</u>"). The Initial Aggregate Receivables Principal Balance is equal to $1,083,905,566.10. A portion of the Initial Aggregate Receivables Principal Balance, equal to $758,686,746.59, shall be paid to the Seller in immediately available funds and the balance of such purchase price shall be paid through an increase in Seller's capital account in Ally Auto (as a result of a deemed capital contribution from Seller to Ally Auto), equal to $325,218,819.51. The amount of the deemed capital contribution shall be duly recorded by the Seller and Ally Auto.

SECTION 2.03 <u>The Closing</u>. The sale and purchase of the Receivables shall take place at the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, on the Closing Date at a time mutually agreeable to the Seller and Ally Auto, and will occur simultaneously with the closing of transactions contemplated by the Further Transfer Agreements.

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex43.htm
P. 2-3

## POOLING AGREEMENT
### Governed by Laws of the State of New York

SECTION 6.04 <u>Governing Law</u>. **THIS AGREEMENT AND THE FIRST STEP RECEIVABLES ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.**

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex43.htm
P. 11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

ALLY BANK

By:  /s/ J. T. Houghton

Name: J. T. Houghton

Title:  Treasurer & Chief Investment Management Officer

***CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016***
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

ALLY AUTO ASSETS LLC

By:     /s/ M.T. St. Charles
Name: M.T. St. Charles
Title:  Vice President

Pooling Agreement (AART 2015-2)

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex43.htm
**Page 14**

## TRUST AGREEMENT
### Governing agreement between Depositor and Owner Trustee

**TRUST AGREEMENT**

**BETWEEN**

**ALLY AUTO ASSETS LLC,**

**DEPOSITOR**

**AND**

**BNY MELLON TRUST OF DELAWARE,**

**OWNER TRUSTEE**

**DATED AS OF SEPTEMBER 16, 2015**

**Located at:**

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex42.htm

## TRUST AGREEMENT
### Governed by Laws of the State of Delaware

Section 9.11 Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex42.htm
**P. 32**

Page | 20

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## SERVICING AGREEMENT
### Governing agreement among Originator, Depositor and Trust

SERVICING AGREEMENT

AMONG

ALLY FINANCIAL INC.

ALLY AUTO ASSETS LLC

AND

ALLY AUTO RECEIVABLES TRUST 2015-2

DATED AS OF SEPTEMBER 16, 2015

### Located at:
http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex994.htm

## SERVICING AGREEMENT
### Governed by Laws of the State of New York

SECTION 10.05 <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex994.htm

P.32

Page | 21

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## INDENTURE

### ALLY AUTO RECEIVABLES TRUST 2015-2

Class A-1 0.45000% Asset Backed Notes
Class A-2a 0.98% Asset Backed Notes
Class A-2b Floating Rate Asset Backed Notes
Class A-3 1.49% Asset Backed Notes
Class A-4 1.84% Asset Backed Notes
Class B 2.07% Asset Backed Notes
Class C 2.41% Asset Backed Notes
Class D 3.01% Asset Backed Notes

---

### INDENTURE

### Dated as of September 16, 2015

---

### DEUTSCHE BANK TRUST COMPANY AMERICAS
### Indenture Trustee

**TRUST organized under laws of the State of Delaware but agreement governing the administration of loan conveyance and cashflows under the laws of the State of New York. The particular provision below is yet in executory (in effect, incomplete) form:**

ALLY AUTO RECEIVABLES TRUST 2015-2

CLASS A-1 0.45000% ASSET BACKED NOTES

ALLY AUTO RECEIVABLES TRUST 2015-2, a statutory trust organized and existing under the laws of the State of Delaware (herein referred to as the "Issuing Entity"), for value received, hereby promises to pay to [        ] [Cede & Co., or registered assigns,] the principal sum of [        ] DOLLARS ($[        ]) or such lesser outstanding amount as may be payable in accordance with the Indenture (as defined on the reverse side of this Note), on each Distribution Date, in an amount equal to the result obtained by multiplying (i) a fraction, the numerator of which is the initial principal amount hereof and the denominator of which is the aggregate initial principal amount for such Class A-1 Notes by (ii) the aggregate amount, if any, payable on such Distribution Date from the Note Distribution Account in respect of principal on the Class A-1 Notes pursuant to Sections 2.7, 3.1 and 8.2(c) of the Indenture;

Ex. C-1-4

---

provided, however, that the entire unpaid principal amount of this Note shall be due and payable on September 15, 2016 (the "Final Scheduled Distribution Date") unless this Class A-1 Note is earlier redeemed pursuant to Section 10.1 of the Indenture, in which case such unpaid principal amount shall be due on the Redemption Date. The Issuing Entity shall

Page | 22

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*

Certified Forensic Loan Auditors

pay interest on this Class A-1 Note at the rate per annum shown above on each Distribution Date until the principal of this Class A-1 Note is paid or made available for payment on the principal amount of this Class A-1 Note outstanding on the preceding Distribution Date (after giving effect to all payments of principal made on the preceding Distribution Date (or, for the initial Distribution Date, the outstanding principal balance on the Closing Date)). Interest on the Class A-1 Notes will accrue from and including the Closing Date and will be payable on each Distribution Date in an amount equal to the Note Class Interest Distributable Amount for such Distribution Date for the Class A-1 Notes. Interest will be computed on the basis of actual number of days elapsed from and including the prior Distribution Date (or, in the case of the first Distribution Date, from and including the Closing Date) to but excluding the current Distribution Date and a 360-day year. Such principal of and interest on this Class A-1 Note shall be paid in the manner specified on the reverse hereof. All interest payments on each class of Notes on any Distribution Date shall be made pro rata to the Noteholders of such class entitled thereto.

**http://www.sec.gov/Archives/edgar/data/1477336/000119312515323413/d25331dex41.htm**

**Indenture agreement also governed by laws of the State of New York**

SECTION 11.13 Governing Law. THIS INDENTURE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

**New York State Trust Law Statutes state:**

Unless an asset is transferred into a lifetime trust, the asset does not become trust property. (NY Estates, Powers and Trust Law § 7-1.18).

A trustee's act that is contrary to the trust agreement is void. (NY Estates, Powers and Trust Law § 7-2.4)

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

# SECTION 3:    FORECLOSURE

**Recorded Events on the Loan Including Foreclosure Issues and Securitization**

| Recorded Chain of Title Possession | | Chain of Note Possession | |
|---|---|---|---|
| Date | Original Title | Date | Note Holder |
| Date to be determined, if any Instrument # Unrecorded Official Records, State of Connecticut | Michael D. Knight (Borrower) European Auto Expo (Lender) | December 18, 2014 | European Auto Expo ( Lender) Principal Amount: $49,497.41 |

# REPORT SUMMARY

**Retail Installment Sale Contract – Simple Finance Charge:**

- On December 18, 2014, Debtor Michael D. Knight executed a Retail Installment Sale Contract in the amount of $ 49,497.41.  In a search of State of Connecticut Uniform Commercial Code records, there were no findings of the perfection of the security interest.  *The original lender of contract is European Auto Expo.  Loan is serviced by Ally Bank.*

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

**Connecticut Secretary of State UCC Inquiry 'Michael Knight' gave results only for 'Michael J. Knight' in a search on May 15, 2016. Detail for that particular lien also did not match the date or address of client. Thus, financing statement for subject property NOT recorded.**

← → C  www.concord-sots.ct.gov/CONCORD/online?sn=PublicInquiry&eid=9755

DENISE W. MERRILL
CONNECTICUT SECRETARY OF THE STATE

**UCC Inquiry**

| UCC Inquiry | |
|---|---|
| • Search by Debtor Name | |
| First Personal Name | Michael |
| Surname * | Knight |
| Search Debtor by Business Name | |
| Search by Lien Number | |

UCC Reports

| | |
|---|---|
| Create Report by Debtor Business Name | |
| Create Report by Debtor Name | |
| First Personal Name | |
| Surname * | |
| Number of Records per page | 25 ▾ |

Search   Reset

[*] Indicates Required Field

← → C  www.concord-sots.ct.gov/CONCORD/online?sn=PublicInquiry&eid=9755

DENISE W. MERRILL
CONNECTICUT SECRETARY OF THE STATE

**UCC Inquiry**

UCC Inquiry Result

| Search Criteria | |
|---|---|
| Searched on | MICHAEL KNIGHT* |

Total Number of Matches: 2

| Prefix | First Personal Name | Middle Name | Surname |
|---|---|---|---|
| | MICHAEL | J | KNIGHT |

Back

http://www.concord-sots.ct.gov/CONCORD/online?sn=PublicInquiry&eid=9755

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

# BLOOMBERG SEARCH SECTION

On **May 5, 2016**, I researched the Bloomberg online Database at the request of **Certified Forensic Loan Auditors, LLC** on behalf of **Michael D. Knight** whose personal property is noted herein above. The Loan Level Data search conducted using Bloomberg's terminal did not reveal matching characteristics based on the Original Amount: **$49,497.41**; Origination Date: **December 18, 2014**; Location of Property: **Hamden, CT**; Property Type: **Motor Vehicle.** Examiner, however, did locate a prospective REMIC TRUST within the Securities Exchange Commission (SEC) website that matches the characteristics for the possibility of securitizing this loan. Bloomberg snapshots of that trust are shown below.

Identification of exact securitized trust or Ally Bank corporate portfolio may be obtained through a Qualified Written Request, a Request for Information under Regulations X and Z, A Freedom of Information Act Request, voluntary lender disclosure or discovery through litigation.

While European Auto Expo originated the loan, any subsequent purchaser may not have recorded its interest in the subject loan pursuant to the requirements of the Connecticut Commercial Code.  No UCC filing necessary to perfect the security interest to a purchasing party was evident in a State of Connecticut search.  A transfer to a party other than the original lender would thus be unsecured until such perfection requirements were met.

*(This space intentionally left blank)*

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## DESCRIPTION OF SECURITY
### Issue considered as private placement. No rating agency ratings sought.



*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## GROUP SUMMARY

**All Collateral class shows that the original principal was approximately $1.084 billion.  This is at variance with the reported capital raised per the SEC prospectus filing of $763,210,000 for Classes A-2, A-3 and A-4; and $260,000,000 for Class A-1.  Additional capital raised is stated therefore as $60,695,566.  This is an indication of additional collateral having been placed in the trust in an manner unauthorized by the Securities Act of 1933.**



*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## Prospectus gives no indication of amount of capital raised as being an estimate

Prospectus Supplement to Prospectus dated July 9, 2015.
**ALLY AUTO RECEIVABLES TRUST 2015-2**
*Issuing Entity*
*$763,210,000 Asset Backed Notes, Classes A-2, A-3 and A-4*
**ALLY AUTO ASSETS LLC**
*Depositor*
**ALLY BANK**
*Sponsor*
**ally**
**ALLY FINANCIAL INC.**
*Servicer*

You should consider carefully the risk factors beginning on page S-7 in this prospectus supplement and on page 2 in the prospectus.

The notes represent obligations of the issuing entity only. The notes do not represent obligations of or interests in, and are not guaranteed by, Ally Auto Assets LLC, Ally Bank, Ally Financial Inc. or any of their affiliates. Neither the notes nor the receivables are insured or guaranteed by any governmental entity.

This prospectus supplement may be used to offer and sell the notes only if accompanied by the prospectus.

The issuing entity is offering the following classes of notes[1]:

|  | Class A-2a Notes | Class A-2b Notes | Class A-3 Notes | Class A-4 Notes |
|---|---|---|---|---|
| Principal Balance | $150,000,000 | $183,000,000 | $333,000,000 | $97,210,000 |
| Interest Rate | 0.98% | One Month LIBOR + 0.43% | 1.49% | 1.81% |
| Initial Distribution Date | October 15, 2015 | October 15, 2015 | October 15, 2015 | October 15, 2015 |
| Final Scheduled Distribution Date | March 15, 2018 | March 15, 2018 | November 15, 2019 | June 15, 2020 |
| Distribution Frequency | Monthly | Monthly | Monthly | **Monthly** |
| Price to Public | 99.99905% | 100.00000% | 99.99515% | 99.99405% |
| Underwriting Discount | 0.200% | 0.200% | 0.250% | 0.300% |
| Proceeds to the Depositor | 99.79905% | 99.80000% | 99.74515% | 99.69405% |

> The issuing entity will also issue Class A-1 Notes with an initial principal balance of $360,000,000 and a final scheduled distribution date of September 15, 2016.

The interest rate for each class of notes, other than the Class A-2b Notes, will be a fixed rate. The interest rate for the Class A-2b Notes will be a floating rate.

The aggregate principal amount of the securities being offered under this prospectus supplement is $763,210,000.

The primary assets of the issuing entity will be a pool of fixed rate retail installment sale contracts and direct purchase money loans used to finance the purchase of new and used cars and light trucks.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## COLLATERAL CHARACTERISTICS AND PRIVATE-PLACMENT Rule 144A EXEMPTION

**The pool used for financing new and used cars and light trucks, including fixed rate retail installment sale contracts.  Investment restricted to qualified institutions and purchasers.**

| ‹ › ALLYA 2015-2 A1 Mtge   · DES · Related Functions. Menu ...· | Message ★ 口 ✿ ? |
|---|---|
| ALLYA 2015-2 A1  **Paid Off**    CUSIP 02007DAD2    Yield --/-- | |

ALLYA 2015-2 A1    **Paid Off**        CUSIP 02007DAD2        Yield --/--
As of --    Prepay --      WAL --    Collateral 100.0% AUTO 3.8%

ALLYA 2015-2 A1 Mtge        6u) Send                        Page 3/3   Security Description
CUSIP  02007DAD2    4.769(50)20    US AUTO                Yd Buy        1u) Sell
1) Bond Summary    2) Group Summary    3) Comments

Original Collateral Characteristics

TYPE: A pool of fixed rate retail installment sale contracts and direct purchase money loans used to finance the purchase of new and used cars and light trucks.

RESTRICTIONS: Rule 144A eligible

These securities are being offered in the United States to persons who are both (i) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (ii) qualified purchasers (as defined under Section 3(c)(7) under the Investment Company Act of 1940).

**RETAIL INSTALLMENT SALE CONTRACT**
**SIMPLE FINANCE CHARGE**

Dealer Number ____**0355U**____    Contract Number ____

| Buyer Name and Address (Include a County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller (Creditor) (Name and Address) |
|---|---|---|
| MICHAEL D KNIGHT 111 THOMAS ST Hamden CT 16514 | | Europeen Auto Expo 91 US 46 West Lodi NJ 07644 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth in Lending Disclosures below are part of this contract.

| New/Used | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| Used | 2011 | Q156 V6 INFINITI | JN1AZ2NCXBM500619 | Personal, family or household unless indicated below.  ☐ business   ☐ agricultural |

| FEDERAL TRUTH-IN-LENDING DISCLOSURES | | | | | |
|---|---|---|---|---|---|
| **ANNUAL PERCENTAGE RATE** The cost of your credit as a yearly rate | **FINANCE CHARGE** The dollar amount the credit will cost you | **Amount Financed** The amount of credit provided to you or on your behalf | **Total of Payments** The amount you will have paid after you have made all payments as scheduled | **Total Sale Price** The total cost of your purchase on credit, including your down payment of $ _____ | Insurance, %, may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to purchase physical damage insurance. THIS DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. WITHOUT SUCH INSURANCE, YOU MAY NOT OPERATE THIS VEHICLE ON PUBLIC HIGHWAYS. |
| 11.79 % | 21,313.59 | 49,497.41 | 70,811.00 | 73,911.00 | |

Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | $933.48 Monthly beginning | 01/17/15 |

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below:
☐ Optional Credit Insurance

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

### STRUCTURED FINANCE NOTES SCREEN
#### Lists the primary transaction parties

| ‹ › | ALLYA 2015-2 A1 Mtge ▾ | SFNS ▾ | Related Functions Menu ✕ | | Message ★ ⊡ ✿ ?˙ |
|---|---|---|---|---|---|
| ALLYA 2015-2 A1 | **Paid Off** | | CUSIP 02007DAD2 | Yield --/-- | |
| As of -- | Prepay -- | WAL -- | Collateral 100.0% AUTO 3.8% | | -- |

| 99) Documents ▾ | | Structured Finance Notes |
|---|---|---|
| ALLYA 2015-2 ALLY AUTO RECEIVABLES TRUST | | |
| Underwriter | | |
| Lead Manager | Bank of America Merrill Lynch | |
| Lead Manager | Barclays Capital | |
| Lead Manager | RBC Capital Markets | |
| Co-Manager | BMO Capital Markets | |
| Co-Manager | CIBC World Markets Inc | |
| Co-Manager | Lloyds Securities | |
| Co-Manager | PNC Capital Markets Inc | |
| Co-Manager | Scotiabank | |

| Original Servicers | | Trustee | |
|---|---|---|---|
| Master | Ally Financial Inc | Deutsche Bank Trust | |
| Sub | Ally Servicing LLC | Paying Agent | |
| | | Deutsche Bank Trust | |

| Originator/Seller | Deal% | Asset Manager |
|---|---|---|
| | | Swap Counterparty |

| Insurer | Deal% |
|---|---|

### ISSUE NOT RATED
#### Likely due to restricted placement

| ‹ › | ALLYA 2015-2 A1 Mtge ▾ | RCHG ▾ | Related Functions Menu ✕ | | Message ★ ⊡ ✿ ?˙ |
|---|---|---|---|---|---|

| ALLYA 2015-2 A1 Mtge | | 1) Setup Alert | | Ratings History |
|---|---|---|---|---|
| CUSIP 02007DAD2 | | | Coupon 0.45% | |
| ABS SEQUENTIAL PAYER | | | Maturity Date 9/15/2016 | |
| | | | Issue Date 9/16/2015 | |
| No history available | | | Agencies | |
| | | | ☑ Standard & Poors   ☑ Moody's   ◻ Other | |
| | | | ◻ Fitch   ◻ DBRS | |
| | | | ◻ KBRA   ◻ Morningstar | |

| Agency | Rating Type | Rating | Effective Date↑ |
|---|---|---|---|
| Standard & Poor's | Long Term | NR | 9/16/2015 |
| Moody's | Long Term | NR (sf) | 9/08/2015 |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## VIEW ALL CLASSES

**The trust was split into eight separate investment classes, or tranches, with separate CUSIP (bond trading) numbers. All collateral was further fractionalized into these tranches.**



## TRUST CHARACTERISTICS
### FICO Score distribution



*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## TRUST CHARACTERISTICS
**Collateral Composition and Regional Area**
**(Connecticut and New Jersey located in non-specific "other" region)**



*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## TRUST CHARACTERISTICS
### Collateral Composition and Annual Percentage Rate



*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## TRUST CHARACTERISTICS
### Collateral Composition and Original Term to Maturity



*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## FROM PROSPECTUS
### VEHICLE MAKE

Distribution of the Receivables Pool by Vehicle Make

| Vehicle Make | Percentage of Aggregate Amount Financed |
|---|---|
| Chevrolet | 41.25% |
| GMC | 12.73% |
| Ford | 5.66% |
| Jeep | 5.57% |
| Buick | 5.34% |
| Dodge | 4.60% |
| Ram | 4.46% |
| Cadillac | 3.86% |
| Nissan | 2.21% |
| Kia | 2.00% |

No other vehicle make accounts for more than 1.96% of the Aggregate Amount Financed.

Distribution of the Receivables Pool by Vehicle Model

| Vehicle Model | Percentage of Aggregate Amount Financed |
|---|---|
| Silverado | 14.27% |
| Sierra | 5.60% |
| Equinox | 3.97% |
| Ram Pickup | 3.95% |
| Cruze | 3.86% |
| Acadia | 2.97% |
| Traverse | 2.91% |
| Malibu | 2.80% |
| Camaro | 2.13% |
| Grand Cherokee | 2.12% |

No other vehicle model accounts for more than 2.07% of the Aggregate Amount Financed

http://www.sec.gov/Archives/edgar/data/1477336/000119312515319512/d25614d424b5.htm

P. S-23

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

**Loan level detail not disclosed by individual vehicle**



CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

## RECENT INVESTOR STATEMENT WITH TRUSTEE CONTACT INFORMATION

Statement to Securityholder

Ally Auto Receivables Trust 2015-2

| Distribution Information | Deal Information | |
|---|---|---|
| 1. Distribution Summary | **Deal:** | Ally Auto Receivables Trust 2015-2 |
| | **Asset Type:** | Consumer Retail |
| 2. Factor Summary | | |
| 3. Interest Summary | **Closing Date:** | 9/16/2015 |
| 4. Collections and Distributions | **Bloomberg Ticker:** | ALLYA 2015-2 |
| 5. Collateral Summary | **Collection Period, Begin:** | 3/1/2016 |
| | **Collection Period, End:** | 3/31/2016 |
| 6. Charge-Off and Delinquency Rates | **Determination Date:** | 4/11/2016 |
| | **Distribution Date:** | 4/15/2016 |
| 7. Credit Instruments | ABS Investor Relations - Ally Financial Inc. as Servicer: | |
| | Telephone | (866) 710-4623 |
| 8. Performance Tests | E-Mail | securitization@ally.com |

The Class A-1 Notes, the Class B Notes, the Class C Notes, and the Class D Notes have not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any other jurisdiction. The Class A-1 Notes, the Class B Notes, the Class C Notes, and the Class D Notes are not transferable, other than to a qualified institutional buyer (as defined in Rule 144A) or pursuant to another exemption under the Securities Act, and subject to satisfaction of certain other provisions of the Indenture.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

## BLOOMBERG LAW SEARCH FOR TRUST



## BLOOMBERG LAW DOCKET SEARCH RESULTS



Page | 39

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

## CONCLUSION

### CHAIN OF TITLE

**MICHAEL KNIGHT**

BORROWER
TRUSTOR
GRANTOR

UCC-1

**STATE OF CONNECTICUT**

MAINTAINS ASSIGNMENT
HISTORY

PROMISSORY NOTE

SECURITY INTEREST
UNRECORDED
SPLIT FROM NOTE

MONTHLY
PAYMENTS

NOTE WAS SPLIT
FROM THE DEED

**EUROPEAN AUTO EXPO /
ALLY BANK**
LENDER/
ORIGINATOR

**ALLY FINANCIAL INC.**

MASTER SERVICER

Services individual loans; Aggregates
Collection; Performs Duties under
Trust's Pooling & Servicing Agreement

NOTE WAS SOLD
& TRANSFERRED

**ALLY FINANCIAL INC.**

SELLER
Purchases loans from
originator; forms pool

**BARCLAYS, BofA MERRILL, RBC
CAPITAL, BMO CAPITAL, CIBC,
LLOYDS SECURITIES, PNC
CAPITAL, SCOTIABANK**
UNDERWRITERS
SELLS CERTIFICATES TO
INVESTORS; COLLECTS
OFFERING PROCEEDS

CERTIFICATES

CERTIFICATES

**ALLY AUTO ASSETS
LLC**

DEPOSITOR
Creates Issuing Entity

CERTIFICATES

OFFERING PROCEEDS

**DEUTSCHE BANK NATIONAL TRUST
COMPANY AMERICAS/BNY MELLON
TRUST OF DELAWARE**
TRUSTEE FOR THE TRUST
Represents Investors' Interests;
Calculates Cash Flows; Remits Net
Revenues
**ALLY FINANCIAL INC.**
UNDERLYING CUSTODIAN
Document Custody

**INVESTORS**

Purchase Asset-Backed
Securities as defined in
Certificates

**ALLY AUTO RECEIVABLES TRUST
2015-2**

TRUST FUND – ISSUING ENTITY
Holds pool of loans; issues
certificates

RETURN ON INVESTMENTS

### ARROW LEGEND

PURPLE – LOAN DOCUMENTS
BLUE   – SECURITIES CERTIFICATES
RED    – INVESTOR FUNDS
GREEN  – BORROWER FUNDS

Page | 40

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

ξ For traditional lending prior to Securitization, the original Deed recording was usually the only recorded document in the Chain of Title. That is because banks kept the loans, and did not sell the loan, hence, only the original recording being present in the banks name.

The advent of Securitization, especially through "Private Investors" and not Fannie Mae or Freddie Mac, involved an entirely new process in asset-backed lending. With Securitization, the Notes and Deeds were sold once, twice, three times or more. Using the traditional model would involve recording new Assignments of the Deed and Note as each transfer of the Note or Deed of Trust occurred. Obviously, this required time and money for each recording.

<span style="color:red">(The selling or transferring of the Note is not to be confused with the selling of Servicing Rights, which is simply the right to collect payment on the Note, and keep a small portion of the payment for Servicing Fees. Usually, when a homeowner states that their loan was sold, they are referring to Servicing Rights.)</span>

ξ <span style="color:red">Securitizing a Loan</span>

Securitizing a loan is the process of selling a loan to Wall Street and private investors. it is a method with many issues to be considered. The methodology of securitizing a loan generally followed these steps:

- A Wall Street firm would approach other entities about issuing a "Series of Bonds" for sale to investors and would come to an agreement. In other words, the Wall Street firm "pre-sold" the bonds.

- The Wall Street firm would approach a lender and usually offer them a warehouse Line of Credit. The Warehouse Credit Line would be used to fund the loan. The Warehouse Line would be covered by restrictions resulting from the initial Pooling & Servicing Agreement Guidelines and Receivables Purchase Agreement or equivalent. These documents outlined the procedures for the creation of the loans and the administering of the loans prior to, and after, the sale of the loans to Wall Street.

- The Lender, with the guidelines, essentially went out and found "buyers" for the loans, people who fit the general characteristics of the Purchase Agreement. (Guidelines were very general and most people could qualify." The Lender would execute the loan and fund it, collecting payments until there were enough loans funded to sell to the Wall Street firm who could then issue the bonds.

- Once the necessary loans were funded, the lender would then sell the loans to the "Sponsor", usually either a subsidiary of the Wall Street firm, of a specially created Corporation of the lender. At this point, the loans are separated into "tranches" of loans, where they will be eventually turned into bonds.

- Next, the loans were "sold" to the "Depositor." This was a "Special Purpose Vehicle" designed with one purpose in mind. That was to create a "bankruptcy remote vehicle" where the lender or other entities are protected from what might happen to the loans, and/or

Page | 41

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

the loans are "protected" from the lender.  The "Depositor" would be, once again, created by the Wall Street firm or the lender.

- Then the "Depositor" would place the loans into the Issuing Entity, which is another entity created solely for the purpose of selling the bonds.

- Finally, the bonds would be sold, with a Trustee appointed to ensure that the bondholders received their monthly payments.

ξ EUROPEAN AUTO EXPO was a "correspondent lender" that originated asset-backed loans. These loans, in turn, may have been sold and transferred into a "federally-approved securitization" trust named the ALLY AUTO RECEIVABLES TRUST 2015-2.

ξ The Note and Deed have taken two distinctly different paths. The Note may have been securitized into the ALLY AUTO RECEIVABLES TRUST 2015-2.

ξ The written agreement that created the ALLY AUTO RECEIVABLES TRUST 2015-2 is a "Pooling and Servicing Agreement" (PSA), and is a matter of public record, available on the website of the Securities Exchange Commission. The Trust is also described in a "Prospectus Supplement," also available on the SEC website. The Trust by its terms set a "CLOSING DATE" of ON OR ABOUT SEPTEMBER 16, 2015. The promissory note in this case became trust property in compliance with the requirement set forth in the PSA. The Trust agreement is filed under oath with the Securities and Exchange Commission. The acquisition of the assets of the subject Trust and the PSA are governed under the law.

ξ In view of the foregoing, the Assignment of Deed of Trust executed after the Trust's Closing Date would be a void act for the reason that it violated the express terms of the Trust instrument.

ξ The loan was originally made to EUROPEAN AUTO EXPO and may have been sold and transferred to ALLY AUTO RECEIVABLES TRUST 2015-2. There is no record of Assignments to either the Sponsor or Depositor as required by the Pooling and Servicing Agreement.

> In Carpenter v. Longan 16 Wall. 271,83 U.S. 271, 274, 21 L.Ed. 313 (1872), the U.S. Supreme Court stated "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."

>> An obligation can exist with or without security. With no security, the obligation is unsecured but still valid. A security interest, however, cannot exist without an underlying existing obligation. It is impossible to define security apart from its relationship to the promise or obligation it secures. The obligation and the security are commonly drafted as separate documents – typically a promissory note and a deed of trust. If the creditor transfers the note but not the deed of trust, the transferee receives a secured note; the security follows the note, legally if not physically. If the transferee is given the deed of trust without the note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the note as well, if such was the agreement.  (Kelley v. Upshaw 91952) 39 C.2d 179, 246 P.2d 23; Polhemus v. Trainer (1866) 30C 685).

Page | 42



**Certified Forensic Loan Auditors**

"Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000).

By statute, assignment of the mortgage carries with it the assignment of the debt. . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust."

The above is analogous for other asset-backed securities, such as auto loans.

## Securitization Summary

1. Generally, if the security instrument and the Note are not together with the same entity, there can be no legal enforcement of the Note. The security instrument enforces the Note and provides the capability for the lender to foreclose on the property. Thus, if the Security instrument and the Note are separated, foreclosure legally cannot occur. The Note cannot be enforced by the Security instrument if each contains a different beneficiary; and, if the Security instrument is not itself a legally enforceable instrument, there can be no valid foreclosure on the homeowners' property.

2. No Entity can be a CREDITOR if they do not hold/own the asset in question (i.e. the NOTE and/or the property); a Mortgage Pass Through Trust (i.e. R.E.M.I.C., as defined in Title 26, Subtitle A, Chapter 1, Subchapter M, Part II §§ 850-862) cannot hold assets, for example, for if they do, their tax exempt status is violated and the Trust itself is void ab initio.  This is an indication that either the Trust has either voided its intended Tax Free Status, or the asset is not in fact owned by it.

3. In the event that the loan was sold, pooled and turned into a security, such event would indicate that the alleged holder can no longer claim that it is a real party of interest, as the original lender has been paid in full.

4. Further said, once the Note was converted into a stock, or stock equivalent, that event would indicate that the Note is no longer a Note. If both the Note and the stock, or stock equivalent, exist at the same time, that is known as double dipping. Double dipping is a form of securities fraud.

5. Once a loan has been securitized, which the aforementioned loan may have been done many times, that event would indicate that the loan forever loses its security component (i.e., the Security instrument), and the right to foreclose through the Security instrument is forever lost.

Page | 43

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

6. The findings of this report indicate that the Promissory Note may have been converted into a stock as a permanent fixture. As a stock it is governed as a stock under the rules and regulations of the SEC; hence, the requirement for the filings of the registration statements, pooling and servicing agreements, form 424B-5, et.al. There is no evidence on Record to indicate that the Security instrument was ever transferred concurrently with the purported legal transfer of the Note, such that the Security instrument and Note has been irrevocably separated, thus making a nullity out of the purported security in a property, as claimed.

7. Careful review and examination reveals that this may have been a securitized loan. Any Assignment of Security instrument pretended to be an A to D transaction when in fact the foreclosing party was hiding the A to B, B to C, and C to D facts of true sales, where A is the original lender, B the sponsor/seller, C the bankruptcy-remote depositor, and D, the issuing asset-backed securities trust. They also hid the legal SEC filings, governing the transaction according to our findings. But to be controlled by those SEC filings, the true original loan Note and Security instrument had to be provided by the Document Custodian certified to have been in possession of them by them on or about September 16, 2015. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established at law by agreement. Examiner supplies this report as written testimony and is available for oral testimony.

**DISCLAIMER**

This report was based exclusively on the documentation provided. It also required that we make reasonable assumptions respecting disclosures and certain loan terms that, if erroneous, may result in material differences between our findings and the loan's actual compliance with applicable regulatory requirements. While we believe that our assumptions provide a reasonable basis for the review results, we make no representations or warranties respecting the appropriateness of our assumptions, the completeness of the information considered, or the accuracy of the findings. The contents of this report are being provided with the understanding that we are not providing legal advice, nor do we have any relationship, contractual or otherwise, with anyone other than the recipient. We do not, in providing this report, accept or assume responsibility for any other purpose.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*

10.     According to the PSA, prior to the commencement of the below-described collection matters, Ally Bank sold, transferred, assigned, or otherwise conveyed the receivables owing under the Ally Bank accounts to the Ally Auto Receivables trust 2015-2 , pursuant to the PSA for the benefit of the certificate holders of the  Ally Auto Receivables trust 2015-2

11.     Upon information and belief, the receivable allegedly owing under the Ally Bank account was securitized.

12.     The Ally Auto Receivable Trust 2015-2 is not a subsidiary of Ally Bank.

13.     The Ally Auto Receivable Trust 2015-2 is excluded from Ally Bank's consolidated financial statements in accordance with generally accepted accounting principles in the United States (hereinafter referred to as "GAAP"). Because its securitization activities qualified as sales under GAAP and were not treated as secured financial transactions, Ally Bank removed Auto Loan receivables equal to the amount of the investors' interests in its securitized loans from its consolidated statements of financial conditions (hereinafter referred to as "the Transferred Assets").

14.     Ally Bank received consideration or compensation for the Transferred Assets

15.     As of the time of the transfer, Ally Bank surrendered control over the Transferred Assets to the Trust and thereafter no longer maintained effective control over the Transferred Assets.

16.     Pursuant to the PSA, all collections received by the Defendants were deposited by them into collections accounts maintained by the Deutsche Bank Trust Company Americas.

## V. THE KNIGHT COLLECTION MATTER ALLEGATIONS

17.     Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein,

18.     On [date of lawsuit], Ally Bank (or an assignee of Ally Bank) commenced a collection lawsuit against plaintiff by filing the civil action complaint which is attached hereto as **EXHIBIT "__A__".** An agent acting on behalf of Ally Bank, in his individual capacity, verified in the Affidavit of Claim, the accuracy of the collection matter Complaint.

19.     Also, Plaintiff has continuously received account statements from Ally Bank, on Ally Bank letterhead, and plaintiff has always believed at the relevant times described in this petition that Ally Bank was the beneficial interest holder of the debt, but upon learning of the probable securitization of his Auto Loans, as alleged herein, plaintiff no longer believes that is the case.

## VI. COUNT ONE – UNJUST ENRICHMENT

20.     Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

21.     Pursuant to the Pooling and Servicing Agreement, Ally Bank surrendered its right to collect by lawsuit on the obligation of the Ally Bank Auto Loan account. As set forth above, by way plaintiff said payments to Ally Bank, benefits were conferred on Ally Bank, After plaintiff's account was securitized, Ally Bank continued accepting

payments.  Additionally, Ally Bank collected money from unlawful lawsuits it filed by selling accounts to collection firms and by filing lawsuits in its own name.

22.     Ally Bank accepted, appreciated and has retained such benefits. Under such circumstances described above, it would be inequitable for Ally Bank to retain such benefits without payment of value. The conduct of Ally Bank was done willfully and in reckless disregard for the rights of plaintiff thereby making the award of punitive damages just and appropriate.

23.     WHEREFORE, Plaintiff, MICHAEL D. KNIGHT demands compensatory and punitive damages against the Ally Bank, and the other defendants, both jointly and severally, in an amount in excess of $150,000.00, plus court costs, counsel fees, and such other relief as this.

### VII. COUNT TWO - VIOLATION OF THE FAIR CREDIT EXTENSION UNIFORMITY ACT (FCEUA), 73, P.S. §§ 2270.1 - 2210.6 AGAINST Ally Bank

24.     Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

25.     The alleged Auto Loan account obligation was a debt within the meaning of the FCEUA, 73 P.S. § 2270.3 Because he was allegedly obligated to pay the Auto Loan account debt, plaintiff is a "consumer" within the meaning of the FCEUA 73 P.S. § 2270.3 Because the Auto Loan account debt was alleged to be owed to it, Ally Bank is a "creditor" within the meaning of the FCEUA 73 P S § 2270.3.

26.     Ally Bank violated the FCEUA by using false, deceptive, and/or misleading representations and/or means in connection with the collection of a debt. FCEUA 73 P.S. § 2270.3

27.   Ally Bank violated the FCEUA by falsely representing the character, amount, and/or legal status of a debt. 73 P.S. § 2270.4(b)(5)(ii).  Ally Bank violated the FCEUA by attempting to collect an amount (including interest, fees, and charges) not expressly authorized by any agreement creating the debt or permitted by law. 73 P.S. § 2270.4(b)(6)(I).

28.   Pursuant to FCEUA, 73 P.S. §2270.5(a), if a creditor engages in an unfair or deceptive debt collection act or practice under FCEUA, it shall constitute a violation.

29.   WHEREFORE, Plaintiff respectfully request that the Court enter judgment in their favor and against all defendants for:

(a)   Actual damages, including but not limited to costs and attorney's fees to defend the collection matter;

(b)   Treble damages;

(e)   Costs and reasonable attorney fees; and

(d)   Such other and further relief as may be just and proper.

## VIII. COUNT THREE - VIOLATIONS OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA), 15 U.S.C. §§ 1692 -1692p, AGAINST ALL DEFENDANTS

30.   Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

31.   Each Ally Bank account obligation was a "debt" within the meaning of FDCPA, 15U.S.C. § 1692a(5).  Because they were allegedly obligated to pay the Ally Bank account obligation, plaintiff was a "consumer" within the meaning of FDCPA, 15 U S C § 1692a(3). The Ally Auto Receivable Trust 2015-2bought or was assigned Ally Bank

debt. Since Ally Bank no longer owned the securitized debt it had previously written off, there was nothing for Ally Bank to sell or to be assigned.

32.     Each of said defendants, at times relevant hereto, was a person who used an instrumentality of interstate commerce or the mails in a business the principal purpose of which was the collection of debts, who regularly collected or attempted to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Based on said activity or activities, each of said Defendants was a debt collector within the meaning of FDCPA, 15 U.S.C. § 1692.

33.     Ally Bank and the Ally Auto Receivables Trust 2015-2 , as the purported assignee of Ally Bank, violated FDCPA by using false, deceptive, and/or misleading representations and/or means in connection with the collection of the Ally Bank account obligation, 5 U.S.0 § 1692(e).

34.     Said defendants violated FDCPA by falsely representing the character, amount, and/or legal status of the Ally Bank account obligation. 15 U.S.C. § 16923(2)(A),

35.     Said defendants violated FDCPA by using a false representation or deceptive means to attempt to collect the Ally Bank account obligation. 15 U.S.C. 1692e(i0).

36.     Said defendants violated FDCPA by attempting to collect an amount (including interest, fees and charges) not expressly authorized by any agreement creating the Ally Bank account obligation or permitted by law, 15 U.S.C. § 192f(1).

37.     WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against said defendants, pursuant to FDCPA, 15 U.S.C. § 1602k(a), as follows:

(a)     Actual damages, including, but not limited to, costs and attorney's fees to

defend the collection matter.

(b)     From each said defendant, statutory damages of $1,000.00 for each named plaintiff and, an amount not to exceed the lesser of $500,000.00 or 1% of the net worth of such defendant; and

(c)     Costs of this action and reasonable attorney fees.

## IX. COUNT FOUR – INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

38.     Plaintiffs and the Class incorporate by reference the foregoing paragraphs as though fully set forth herein.

39.     Pursuant to the PSA, Ally Bank surrendered its right to collect on the obligation of the plaintiff when Ally Bank accepted, appreciated, and retained such benefits of selling the note to SLM Funding, LLC, which in turn sold the note to the Deutsche Bank Trust Company Americas as Trustee for the Ally Auto Receivables Trust 2015-2.

40.     This collection scheme caused the plaintiff emotional distress. The conduct of Ally Bank was done negligently AND/OR intentionally and in disregard for the rights of plaintiff thereby making the award of punitive damages just and appropriate.

41.     WHEREFORE, plaintiff demands compensatory and punitive damages against the Ally Bank, and the other defendants, both jointly and severally, in an amount in excess of:

a. $150,000.00, plus court costs, counsel fees and such other relief as this Honorable Court deems appropriate.

## X. COUNT FIVE - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS 18 USC section 1962

42.    Plaintiff incorporates and adopts the foregoing paragraphs of the complaint

43.    Plaintiff is a natural person and as such a person is within the meaning of 18 USC section 1963(3)

44.    Defendants-are corporate entities and as such are persons within the meaning of 18 USC section 1961(3)

THE ENTERPRISE

45.    Ally Bank, SLM Funding, LLC, and the Deutsche Bank Trust Company Americas as Trustee for the Ally Auto Receivables Trust 2015-2, and John Does 1 through 100, comprise three distinct groups of people that together form an enterprise within the meaning of 18 USC section 1961(4). Each and every individual is associated with the enterprise.

46.    The enterprise for more than three years has been engaged in activities that affect interstate commerce and remains continuous and open ended.

PATTERN OF RACKETEERING AND MAIL FRAUD

47.    Defendants have devised a scheme to defraud and obtain money by means of fraudulent pretenses by selling or assigning a debt that they no longer owned to the Ally Auto Receivables Trust 2015-2, and then misrepresenting its ownership of the debt while still collecting on such debts in its own name without actual ownership.

48.    Defendants have engaged In at least two acts of racketeering activity in interstate commerce through a pattern of racketeering activity including but not limited to mail fraud and bank fraud In violation of 18 USC section 1341, 1343 and 1344 to support a fraudulent scheme.

49.    Each of the uses of the mails and wires in connection with the defendants actions as herein described, which constitutes a separate act of mail and wire fraud and Is thus a predicate act which constitutes a pattern of racketeering activity.

50.    Each defendant agreed and conspired to engage in this illegal conduct. Plaintiff and the class has been forced and threatened to pay debts they did not owe constituting an injury to property within the meaning of 18 USC 1962 by actions of defendants and their cc conspirators In violation of 18 USC section 1962(c) and (d).

## XI. COUNT SEVEN - DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

51.    Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein,

52.    An actual case and substantial controversy exists between plaintiff and the defendants with respect to their unfair or deceptive acts or practices and misleading misrepresentatives and non-disclosure of material facts relating to their debt collection practices.

53.    Defendants' conduct directly and proximately caused plaintiff significant damages. Defendants contend to the contrary. Therefore, the parties herein have adverse legal interests of sufficient immediacy and reality to warrant the issuance of declaratory relief. Plaintiff, on behalf of himself and all others similarly situated, is entitled to adjudication declaring defendants' practice of perpetrating unfair or deceptive acts and misleading misrepresentations and non-disclosure of material facts

54.     Defendants continue their deceptive and misleading debt collection practices, and, therefore, defendants should be prohibited and enjoined from engaging in these practices in the future.

55.     WHEREFORE, Plaintiff requests that this Court enter judgment in his favor and against all defendants as follows:

(a)     A declaration that Ally Bank, or any purported assignee of the note other than the Ally Auto Receivables Trust 2015-2, is not the proper plaintiff to sue to collect receivables that it has securitized, and by doing so, it and its counsel, the legal defendants, violates Fair Debt Collection Practices Act (FDCPA), and the RICO ACT.

(b)     An Order enjoining Ally Bank, during the pendency of this action and permanently thereafter, from suing any class members to collect receivables that Ally Bank has securitized, prosecuting or maintaining such a collection proceeding, and/or otherwise representing to a current or former consumer account holder that it remained the creditor.

## XII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, MICHAEL D. KNIGHT, respectfully requests this Court, after jury trial on the merits, award damages as requested above, and for such other relief as Plaintiff may show himself entitled.

[Signature of attorney]

111 Thomas St
Hamden, Ct. 06514           *Michael Knight*
203-410-6753

12